2013R00600/DCC

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. 2:15-ce-300-01 |
| | : | |
| v. | : | Crim. No. 15- |
| | : | |
| ALEXANDER BRAZHNIKOV, JR., | : | 18 U.S.C. §§ 371 and 1956(h) |
| a/k/a "Alexander Brazhnikov," | : | |
| and "Alexandre Brajnikov" | : | |

## I N F O R M A T I O N

The defendant having waived in open court prosecution by indictment, the United States Attorney for the District of New Jersey charges:

### Count One

### (Conspiracy to Commit Money Laundering)

1.      At all times relevant to this Information:

a.      Defendant ALEXANDER BRAZHNIKOV, JR., also known as "Alexander Brazhnikov," and as "Alexandre Brajnikov," was a resident of New Jersey.

b.      Defendant ALEXANDER BRAZHNIKOV, JR. was the owner, chief executive officer, and principal operator of the following privately held, New Jersey business entities: (i) ABN UNIVERSAL, INC., a microelectronics export company formerly located in Carteret, NJ; (ii) ZOND-R, INC., a microelectronics export company with its principal place of business in Union, NJ; (iii) TELECOM MULTIPLIERS, a microelectronics export company with its principal place of business in Mountainside, NJ; and (iv) ELECTRONICS CONSULTING, INC., a microelectronics export company with its principal place

of business in Manalapan, NJ (hereinafter, collectively, the "NJ Export Companies").

      c.     CC-1 was a resident of Moscow, Russia, and was the owner, chief executive officer, and principal operator of a privately held, Russian business entity identified as ABN UNIVERSAL, a microelectronics import/export company located in Moscow, Russia (the "Moscow Network").

<u>The International Emergency Economic Powers Act</u>

      d.     The export of "commerce controlled" items was regulated by the U.S. Department of Commerce ("DOC").  Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.*, the President of the United States was granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States.  Under IEEPA, the President could declare a national emergency through Executive Orders that had the full force and effect of law.

      e.     On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to United States goods and technologies and extended the Export Administration Regulations (the "EAR"), 15 C.F.R. §§ 730-774.  Through the EAR, the DOC imposed license or other requirements before an item subject to the EAR could be lawfully exported from the United States or lawfully re-exported from another country.  These items were included on the commerce control list, or "CCL," published at 15 C.F.R. § 774, Supp. 1.  Items on the CCL were categorized by an Export Control Classification Number ("ECCN"), which denoted the applicable export

controls.  The President issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the time of this Information.  *See*, 77 Fed. Reg. 49,699 (Aug. 15, 2012).

f.     Pursuant to its authority derived from IEEPA, the DOC reviewed and controlled the export of certain goods and technology from the U.S. to foreign countries.  In particular, the DOC placed restrictions on the export of goods and technology that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under IEEPA and the EAR, it was a crime to willfully export, or attempt or conspire to export from the United States, any item listed on the CCL for which a license was required without first obtaining the license from the DOC. *See*, 50 U.S.C. § 1705(c); 15 C.F.R. § 764.2.

g.     The DOC's Bureau of Industry and Security ("BIS") contained a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals and other types of legal persons – that were subject to specific license requirements for the export, re-export, and/or transfer (in-country) of specified items.  These persons comprised the Entity List, as enumerated in 15 C.F.R. § 744, Supp. 4. The Entity List specified the license requirements that it imposed on each listed person which were independent of, and in addition to, license requirements imposed elsewhere in the EAR.  15 C.F.R. § 744.1(c) of the EAR prohibited the use of license exceptions for almost all exports and re-exports to listed entities.

3

The Entity List was generally comprised of entities who had engaged in activities that could result in an increased risk of the diversion of exported, re-exported, and transferred (in-country) items to weapons of mass destruction programs.  Grounds for inclusion on the Entity List have also included entities whose activities have been deemed contrary to the national security and/or foreign policy interests of the United States (entities enumerated on the Entity List are referred to herein as a "banned entity").

<u>Electronic Export Information and the Automated Export System</u>

h.     Generally, a DOC Form 7525-V, or Electronic Export Information form, was required to be filed electronically with the DOC via the Automated Export System for all shipments sent to foreign countries regardless of the method of transportation, subject to certain restrictions.  As it applies to the charges in the Information, Electronic Export Information forms were required to be filed when: (i) an item required an export license; (ii) was bound for an embargoed country; or (iii) the value of the item(s) was greater than $2,500 (U.S.).  Criminal penalties for unlawful export information activities as they pertain to Electronic Export Information forms were prescribed by 13 U.S.C. § 305.

<u>End-User and End-Use Information</u>

i.     End-user and end-use information was often required by United States-based manufacturers and distributors before they would sell controlled or non-controlled goods to re-sellers or exporters.  The DOC required that a completed form BIS-711 ("Statement by Ultimate Consignee and

Purchaser") be included as part of an application for authorization to export certain controlled items, subject to the parameters of 15 C.F.R. §§ 748, et. seq.

The Conspiracy

2.     From in or about January 2008 through in or about June 2014, in Union County, in the District of New Jersey and elsewhere, the defendant

ALEXANDER BRAZHNIKOV, JR.<br>aka "Alexander Brazhnikov" and "Alexandre Brajnikov,"

did knowingly and intentionally conspire with CC-1 and with others to transmit and transfer monetary instruments and funds from a place outside the United States, to wit, Russia, to a place in the United States, to wit, New Jersey, with the intent to promote the carrying on of specified unlawful activity, namely the smuggling of electronics components from the United States, contrary to Title 18, United States Code, Section 554(a), and contrary to Title 18, United States Code, Section 1956(a)(2)(A).

Object of the Conspiracy

3.     It was the object of the conspiracy for defendant ALEXANDER BRAZHNIKOV, JR. to receive money from Russian sources to purchase large quantities of electronics components for the purpose of unlawfully exporting those parts to Russia.

Manner and Means of the Conspiracy

4.     It was a part of the conspiracy that CC-1, by and through the Moscow Network, obtained initial requests for quotes ("RFQs") for United States-based electronics components from various Russian entities, including defense contractors licensed to procure parts for the Russian military, the

5

Federal Security Service of the Russian Federation (the "FSB"), and Russian entities involved in the design of nuclear weapons and tactical platforms, and communicated those RFQ's either directly to United States-based vendors by electronic means or by sending the requests to defendant ALEXANDER BRAZHNIKOV, JR. and the NJ Export Companies for implementation.

5.      It was further part of the conspiracy that through the NJ Export Companies, defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators facilitated the illicit purchase and acquisition of the requested components from the various United States-based vendors by concealing the true identity of the ultimate end-user, as well as the intended end-use of the components in Russia.

6.      It was further part of the conspiracy that the funds for these illicit transactions were initially obtained by CC-1 and the Moscow Network from the various Russian purchasers, which included Russian defense contracting firms that were authorized to supply electronic components and parts to the Russian military, the FSB, and Russian entities involved in the design of nuclear warheads, as well as nuclear weapons strategic and tactical platforms.

7.      It was further part of the conspiracy that the funds obtained from the various Russian purchasers were deposited and were caused to be deposited by CC-1 and the Moscow Network into one of the conspirators' primary Russian-based bank accounts (the "Russian Funding Account").

8.      It was further part of the conspiracy that defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators caused the creation of dozens of shell companies with bank accounts in the British Virgin Islands,

Latvia, Marshall Islands, Panama, Ireland, England, United Arab Emirates, and Belize, for the purpose of conducting financial transactions to facilitate the unlawful export of electronics components to Russia.

9.    It was further part of the conspiracy that disbursements for defendant ALEXANDER BRAZHNIKOV, JR.'s purchases of electronic components in the United States were made from the Russian Funding Account through one or more foreign accounts held by the conspirators' various shell corporations, and ultimately into United States-based accounts held by defendant ALEXANDER BRAZHNIKOV, JR. and the NJ Export Companies.  These disbursements concealed the true sources of funds in Russia, as well as the identities of the various Russian end-users who were unlawfully receiving electronics components made in the United States.

10.    It was further part of the conspiracy that approximately $65,000,000 in wire transfers passed through and among the various bank accounts and foreign shell companies controlled by defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators, and that these funds were utilized to make illicit purchases of United States-based electronic components on behalf of Russian purchasers, including defense contracting firms that were authorized to supply electronic components and parts to the Russian military and the FSB (collectively, paragraphs 1 through 10 are sometimes referred to herein as the "Money Laundering Scheme").

All in violation of Title 18, United States Code, Section 1956(h).

## Count Two

### (Conspiracy to Smuggle Goods from the United States)

1.      The allegations set forth in paragraphs 1 through 10 of Count One of this Information are re-alleged as if set forth herein.

### The Conspiracy

2.      From in or about January 2008 through in or about June 2014, in Union County, in the District of New Jersey and elsewhere, the defendant

ALEXANDER BRAZHNIKOV, JR.
aka "Alexander Brazhnikov" and "Alexandre Brajnikov,"

did knowingly and intentionally conspire and agree with CC-1 and with others to fraudulently export and send from the United States merchandise, articles, and objects, including electronics components, contrary to Title 13, United States Code, Section 305, and to receive, conceal, buy, sell and in any manner facilitate the transportation, concealment, or sale of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, contrary to Title 18, United States Code, Section 554(a).

### Object of the Conspiracy

3.      It was the object of the conspiracy for defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators to smuggle electronics components manufactured by United States-based corporations from the United States to Russia on behalf of Russian-based purchasers, including defense contractors licensed to procure parts for the Russian military, the FSB, and Russian entities involved in the design of nuclear weapons and tactical platforms.

8

## Manner and Means of the Conspiracy

4.     It was a part of the conspiracy that, once the NJ Export Companies purchased and received shipments of electronics components facilitated by the Money Laundering Scheme, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators re-packaged and prepared the parts for export to Russia via various shipping companies based in New York and New Jersey.

5.     It was further part of the conspiracy that defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators routinely and systematically falsified the true value of the exported items on shipping documents in order to evade the legal requirement of filing an Electronic Export Information via the Automated Export System, thereby concealing the full extent of their unlawful export activities from the United States.

6.     It was further part of the conspiracy that defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators routinely and systematically concealed the true destination, and therefore, the true end-user of the parts they were exporting, by directing that the shipments be sent to false addresses in Russia that were actually controlled by CC-1 and the Moscow Network.

7.     It was further part of the conspiracy that from in or about January 2010, through in or about June 2014, defendant ALEXANDER BRAZHNIKOV, JR., utilized the NJ Export Companies to complete approximately 1,923 separate export shipments from New Jersey to Russia, the majority of which did not contain the required filing of an Electronic Export Information form on the Automated Export System.

Overt Acts

8.     In furtherance of the conspiracy, and to effect its unlawful object, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators committed and caused to be committed the following overt acts in the District of New Jersey and elsewhere:

a.     On or about March 6, 2013, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators exported a shipment of electronics components from New Jersey to a false address in Russia, and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $38,612.50 to $154.45.

b.     On or about March 8, 2013, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators exported a shipment of electronics components from New Jersey to a false address in Russia, and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $77,155.00 to $154.31.

c.     On or about March 15, 2013, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators exported a shipment of electronics components from New Jersey to a false address in Russia, and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $25,736.66 to $154.42.

d.      On or about March 21, 2013, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators exported a shipment of electronics components from New Jersey to a false address Russia, and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $110,000.00 to $1,845.76.

e.      On or about February 10, 2014, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators exported a shipment of electronics components from New Jersey to a false address Russia, and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $30,000.00 to $154.52.

All in violation of Title 18, United States Code, Section 371.

## Count Three

### (Conspiracy to Violate the IEEPA)

1.    The allegations set forth in paragraphs 1 through 10 of Count One and paragraphs 1-8 of Count Two of this Information are re-alleged as if set forth herein.

### The Conspiracy

2.    From in or about January 2008 through in or about June 2014, in Union County, in the District of New Jersey and elsewhere, the defendant

ALEXANDER BRAZHNIKOV, JR.
aka "Alexander Brazhnikov" and "Alexandre Brajnikov,"

did knowingly and intentionally conspire and agree with CC-1 and with others to willfully export from the United States to Russia items under the jurisdiction of the DOC, to wit, electronics components, without first having obtained the required licenses from the DOC, contrary to Title 50, United States Code, Sections 1702 and 1705, and Title 15, Code of Federal Regulations, Section 764.2.

### Object of the Conspiracy

3.    It was the object of the conspiracy for defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators to evade the EAR by supplying controlled electronics components to Russian end-users, including defense contractors licensed to procure parts for the Russian military, the FSB, and Russian entities involved in the design of nuclear weapons and tactical platforms.

<u>Manner and Means of the Conspiracy</u>

4.    It was a part of the conspiracy that, utilizing funds obtained through the Money Laundering Scheme, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators purchased electronics components from United States-based manufacturers and distributors, and arranged for the export of those goods to false addresses in Russia which were established and controlled by CC-1 and the Moscow Network.

5.    It was further part of the conspiracy that CC-1, by and through the Moscow Network, would, in turn, distribute the electronics components to Russian defense contractors who were licensed to procure parts for the Russian military, the FSB, and Russian entities involved in the design of nuclear weapons and tactical platforms.

6.    It was further part of the conspiracy that defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators purposefully exported and caused to be exported electronics components from the United States to Russia knowing that, although licenses were required for such exports, licenses had not been obtained.

7.    It was further part of the conspiracy that, in order to evade the EAR and to conceal Russian government and military end-users, defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators concealed and falsified end-use and end-user information in connection with the purchase and export of electronics components.

8.      It was further part of the conspiracy that, in order to obtain electronics components from United States-based manufacturers and suppliers, and to avoid scrutiny by government regulators, defendant ALEXANDER BRAZHNIKOV, JR., CC-1, and their co-conspirators provided materially false information regarding the NJ Export Companies' true export function, including the submission of false end-user information to manufacturers and suppliers.

<u>Overt Acts</u>

9.      In furtherance of the conspiracy, and to effect its unlawful object, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators committed and caused to be committed the following overt acts in the District of New Jersey and elsewhere:

a.      On or about October 18, 2012, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators caused the export of electronics components obtained from United States manufacturer "A," specifically, power detectors and fast settling, logarithmic detectors and controllers, from the United States to Russia on behalf of a banned entity for which no export license could have lawfully been obtained.

b.      On or about October 18, 2012, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators caused the export of electronics components obtained from United States manufacturer "B," specifically, miniature power relay equipment, from the United States to Russia on behalf of a banned entity for which no export license could have lawfully been obtained.

14

c. On or about October 18, 2012, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators caused the export of electronics components obtained from United States manufacturer "C," specifically, thermistors for overload protection, from the United States to Russia on behalf of a banned entity for which no export license could have lawfully been obtained.

d. On or about November 20, 2013, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators caused the export of electronics components obtained from United States manufacturer "D," including high speed, high output current, voltage feedback amplifiers, from the United States to Russia on behalf of a banned entity for which no export license could have lawfully been obtained.

e. On or about April 23, 2014, defendant ALEXANDER BRAZHNIKOV, JR. and his co-conspirators caused the export of electronics components obtained from United States manufacturer "E," specifically, oscillator frequency upconverters, from the United States to Russia on behalf of a banned entity for which no export license could have lawfully been obtained.

All in violation of Title 18, United States Code, Section 371.

## Criminal Forfeiture Allegations

1.    The United States hereby gives notice to defendant ALEXANDER BRAZHNIKOV, JR. that, upon conviction of the charges set forth in Count One and Count Three of this Information, the government will seek the entry of a forfeiture money judgment in the amount of $65,000,000 in United States currency (the "Forfeiture Money Judgment"), in accordance with Title 18, United States Code Section 982, which requires any person convicted of any such offense, or conspiracy to commit such offense, to forfeit any and all property, real or personal, which constitutes or is derived from proceeds involved in or traceable to a violation of such offenses (the "Forfeitable Property"), as set forth below:

2.    <u>Real Property</u>

a.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 177 Longwood Drive, Unit 177, Oak Knoll Townhouses, Manalapan, New Jersey 07726-3845, more particularly described as: Block 1438, Lot C17-7, Assessor's Parcel No. 28-01438-0000-00001-0000-C17-7, in the Town of Manalapan, Monmouth County, New Jersey, being the same property that was described in a deed recorded as Instrument No. 2006078024 in Book 8565, Page 5411. The current record title holders of this property are "Alexander Brazhnikov," "Zhanna Polonskaya" and "Alexandre Brajnikov."

b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 234 Central Avenue, Mountainside, New Jersey 07092-1950, more

particularly described as: Block 5.T, Lot 65, in the Borough of Mountainside, Union County, New Jersey, being the same property that was described in a grant deed recorded as Instrument No. 227337 in Book 5880, Page 619.  The current record title holders of this property are "Alexander Brazhnikov" and "Zhanna Polonskaya."  Alternatively, in lieu of this property, defendant ALEX BRAZHNIKOV, JR. may pay to the government the sum of $600,000, as a *substitute res*, in lieu of forfeiting the above-referenced real property.  The $600,000 shall not be derived from, involved with, or traceable to the criminal charges outlined herein.

   3.   <u>Bank Accounts</u>

   a.   Up to a total of $2,000,000.00, contained in account number CY29005004820004820731718301 held in the name of "Alexander Brazhnikov" at Hellenic Bank Public Company, Ltd., Nicosia, Cyprus; if and when the funds are repatriated to the United States, they shall be credited towards the Forfeiture Money Judgment;

   b.   $1,879,991.64 previously contained in Sberbank of Russia's interbank or correspondent bank account numbers 0004403077 and 0004169401, held at Deustche Bank Trust Company Americas; and/or account number 8900057610 held at The Bank of New York Mellon; or any other correspondent accounts maintained by Sberbank of Russia at JP Morgan Chase Bank, Wells Fargo, or Bank of America in the United States;

   c.   $699,844.43 previously contained in account number 819009806 held in the name of Zond-R, Inc. at HSBC Bank, which was seized on June 26, 2014;

    d.    $390,914.92 previously contained in account number 8056936322 held in the name of Zond-R, Inc. at PNC Bank, which was seized on June 26, 2014;

    e.    $200,682.16 previously contained in account number 381030608272 held in the name of Zond-R, Inc. at Bank of America, which was seized on June 26, 2014;

    f.    $33,569.32 previously contained in account number 4304570199 held in the name of Epsilon Electronics Corporation at TD Bank, which was seized on June 26, 2014;

    g.    $9,049.44 previously contained in account number 129970920 held in the name of Telecom Multipliers, Inc. at JP Morgan Chase, which was seized on June 26, 2014;

    h.    $427,714.49 previously contained in account number 097-101489 held in the name of "Alexander Brazhnikov" at PNC Investments, LLC, which was seized on October 10, 2014.

    i.    $238.53 previously contained in account number 7527912908 held in the name of Telecom Multipliers, Inc. at Capital One Bank, which was seized on October 10, 2014;

    j.    $15,595.86 previously contained in account number 7057324583 held in the name of Zond-R, Inc. at Capital One Bank, which was seized on October 10, 2014;

k. $33,504.89 previously contained in account number 9345581497 held in the name of "Alexander Brazhnikov" at Citibank, which was seized on October 10, 2014; and

l. $377,522.40 previously contained in account number 5937116 held by Avnet, Inc. at JP Morgan Chase, which was seized on October 10, 2014

4. <u>Currency</u>

a. $6,610 in United States currency seized from Zond-R, Inc., on June 26, 2014.

5. <u>Electronics Components</u>

a. Any and all electronics components, semiconductors, circuits, parts, and related equipment seized from defendant ALEX BRAZHNIKOV, JR., ABN Universal, Inc., Zond-R, Inc., Telecom Multipliers, and Electronics Consulting, from on or about June 26, 2014, through on or about October 8, 2014.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to

Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Sections 982 and 1956.

PAUL J. FISHMAN
United States Attorney

CASE NUMBER: 15-

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

**ALEXANDER BRAZHNIKOV, JR.,**
aka "Alexander Brazhnikov," and
"Alexandre Brajnikov"

# INFORMATION FOR

18 U.S.C. §§ 371 and 1956(h)

**PAUL J. FISHMAN**
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

DENNIS C. CARLETTA
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2767*

USA-48.AD 8
(Ed. 1/97)